IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2005

## ANDREA SPENCER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-28171     Joseph B. Dailey, Judge**

———————————

**No. W2005-01050-CCA-R3-PC  - Filed January 17, 2006**

———————————

The petitioner was convicted of one count of aggravated rape, two counts of aggravated kidnapping, two counts of aggravated burglary, and one count of sexual battery and received an effective sentence of eighty-four years as a multiple offender.  His convictions were affirmed and his sentence was reduced to eighty years on direct appeal by this court. State v. Andrea Spencer, No. W2002-01483-CCA-R3-CD, 2003 WL 22204526, at *1 (Tenn. Crim. App. Sept. 18, 2003), perm. to appeal denied (Tenn. Jan. 5, 2004).  On February 24, 2004, he filed a timely petition for post-conviction relief.  Following an evidentiary hearing, the post-conviction court denied relief.  On appeal, the petitioner argues that he was denied effective assistance at trial because his counsel failed to properly investigate and prepare the defense.  Following our review, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Andrea Spencer.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In the opinion on the direct appeal of the petitioner's convictions, this court set out the facts of the cases upon which he was convicted:

> The Defendant's convictions for sexual battery and one count of aggravated
> burglary relate to incidents on August 30, 1999, involving S.S., the thirteen-year-old

victim. His convictions for aggravated rape, one count of aggravated burglary, and two counts of aggravated kidnapping relate to events involving the same victim on October 30 and 31, 1999.

Loretta Saulter, the victim's mother, testified that in 1999, she, the victim, and her other daughter were living in a two-bedroom duplex on Lamar Cove in Shelby County, Tennessee. She stated that on August 30, 1999, at approximately 12:00 a.m., she was awakened by the victim yelling from her bedroom. The victim then ran into Saulter's bedroom and told her the Defendant had broken into the residence through the window and fondled her while she was sleeping in her bed. Saulter testified that when she ran into the victim's bedroom, no one was there, but the window, which had a broken lock, was open. She stated that on prior occasions, the victim had complained to her that the Defendant, who lived in the same neighborhood, had followed her and attempted to speak to her. Saulter said she reported the incident to the police. The Defendant was not arrested.

Saulter testified that on October 30, 1999, the victim went to a Halloween party with her friends, while Saulter attended another party. The victim had planned to go to her grandmother's house after the party, but she decided to go back to her residence instead. Saulter testified that when she returned to the residence at approximately 3:30 a.m., the victim was not there. She then went to sleep believing that the victim was at her grandmother's house.

Saulter stated that at approximately 6:00 a.m., she was awakened by a neighbor knocking on her front door. The neighbor was holding the victim, who had a sheet wrapped around her. Saulter observed that the victim was scared, bleeding, incoherent, and moaning. Although the victim was wearing a T-shirt, she was not wearing shorts or underwear.

Saulter testified that after the police arrived, the victim was taken to the hospital where she received stitches on her face. She stated that at the time of trial, the victim still had visible scars on her face. As a result of her injuries, the victim was unable to use her hands and arms or attend school for approximately one month. Saulter maintained that the Defendant did not have permission to be inside her home on either occasion.

The victim testified that on August 30, 1999, she was awakened by the Defendant rubbing her buttocks. She was wearing shorts and a T-shirt, and the Defendant's hand was in her shorts and touching her buttocks. The victim stated that although she did not see the Defendant enter her bedroom, her window, which had a broken lock, was closed when she fell asleep and was open when the Defendant awakened her. When the victim jumped out of her bed and yelled for her mother, the Defendant exited her bedroom through the same window.

The victim testified she recognized the Defendant as a neighbor, who, on prior occasions, had followed her and asked her for a date. She stated that after the incident, the Defendant continued to follow her and ask her to "go" with him. The victim asserted she did not give the Defendant permission to be in her bedroom and to touch her. She further stated that after the incident, she began sleeping in her mother's bed.

The victim testified that on October 30, 1999, she attended a Halloween party and returned to her residence at approximately 11:00 p.m. instead of going to her grandmother's home as originally planned. She stated that while she was sleeping in her mother's bedroom, the Defendant entered the room, placed his hands over her nose and mouth, and choked her. The Defendant then drug her by her legs and throat to his duplex, which appeared to be vacant. The victim testified the Defendant told her that he would kill her if she yelled for help. The Defendant took her to a bedroom, threw her on the floor, removed her shorts and underwear, and forced her to engage in penile/vaginal intercourse. The Defendant then drug the victim back to her residence and placed her inside through her bedroom window. The victim stated the Defendant told her that he was "sorry"; that he believed she was "grown"; and that she should not tell anyone.

The victim testified the Defendant then pulled her back outside through the same window. She stated that at the time, she was wearing all of her clothes and was not bleeding. She further stated she had no memory of what occurred next.

The victim testified that when she regained consciousness, she was lying in her backyard. She was injured, bleeding, and missing her shorts and underwear. The victim stated that because she was unable to stand and walk, she attempted to crawl to her front door in order to awaken her mother. She attempted to knock on the door with a bottle, but she dropped the bottle and broke it. A neighbor heard the victim, covered her with a sheet, and retrieved her mother. The victim stated she was taken to the hospital where she received medical treatment, including stitches on both sides of her face.

The victim testified police officers came to her residence the next afternoon, and she identified the Defendant from a photograph array as the man who assaulted her. The officers returned two days later, and she identified the Defendant in a different photograph array as the man who also entered her bedroom in August.

Officer Thomas Avery testified that on August 30, 1999, at approximately 3:30 a.m., he received a call to the victim's residence. The victim told him that while she was sleeping, the Defendant entered the residence through her bedroom window. The victim described the Defendant and informed the officer where the Defendant lived. The officer stated he knocked on the Defendant's front door, but no one

answered, even though the officer heard someone inside the residence. Officer Avery testified he did not have a warrant to enter the Defendant's residence, and he did not believe he could do so without one. He then left the residence and subsequently reported the incident to the Sex Crimes Unit of the Memphis Police Department.

Officer Avery testified that on October 31st at approximately 6:00 a.m., he received another call from the victim's residence. He observed upon his arrival that the victim was severely cut and bleeding profusely. The victim identified the man who injured her as the same man who entered her apartment in August. The victim further identified the place where the incident occurred as the duplex where the Defendant was living in August. Officer Avery testified that upon entering the abandoned duplex, he and other officers found an identification card with a photograph of the Defendant and mail addressed to the Defendant. Officers also located a pair of girl's pajama bottoms and underwear inside the duplex, which otherwise appeared to be vacant.

Sergeant Jimmy Daniels testified that after the Defendant was arrested on October 31, 1999, he observed a cut on the Defendant's finger. Jerry Sims, a latent fingerprint examiner, testified that fingerprints, which an officer lifted from the victim's window on October 31st, matched those of the Defendant.

Sally DiScenza, a forensic nurse examiner, testified she examined the victim on October 31st. She observed that the victim had multiple lacerations on her face and chest, which had been sutured. DiScenza stated the victim had bruises in the area of her vagina, which she opined were consistent with forced sexual penetration. TBI Agent Chad Johnson testified sperm, which he found on the victim's vaginal swab, matched that of the Defendant.

The Defendant testified he spoke to the victim on numerous occasions, and the victim was friendly with him. He stated the victim told him that she was nineteen years old. The Defendant denied breaking into the victim's residence and fondling her on August 30, 1999. He further stated the police did not knock on his door that night, and had the police done so, he would have answered.

The Defendant testified he and the victim had consensual sex in her bedroom on October 30, 1999, between 5:30 and 6:00 p.m. He denied forcing the victim to engage in sex and injuring her. He stated he cut his finger while repairing his son's wagon.

The Defendant testified that after he was arrested, he gave a statement to the police in which he denied entering the victim's residence and engaging in sexual intercourse with her. He further stated that while he was incarcerated, he wrote letters to the victim's mother asking for forgiveness.

-4-

Id. at \*\*1-4 (footnote omitted).

## ANALYSIS

On appeal, the petitioner argues that trial counsel did not provide effective assistance because counsel "failed to investigate [the petitioner's] case adequately, and did not review case materials with him"; counsel "failed to meet with [the petitioner] pre-trial to explain his total exposure in the event of conviction"; counsel "refused to discuss his case with [the petitioner]"; counsel "failed to contact potential alibi witnesses"; and counsel "ignored [the petitioner] during [the] trial." The State responds that the petitioner failed to prove that trial counsel was ineffective. We will review these claims.

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

The only witnesses to testify at the evidentiary hearing were the petitioner and his trial counsel. Acknowledging he had testified at trial that he had consensual relations with the victim, the petitioner spoke of the witnesses whom he believed should have been called to testify:

Q       All right. My question to you is, these witnesses – I believe you said you should have or could have called. What would they have presented differently or in addition to what you had to say that would have swayed the jury?

-6-

[Q]    Were these witnesses in the room when you had consen[s]ual sex with this girl?

A      No.

Q      So they couldn't say, definitely, whether or not you had actually consented – whether she consented to have sex with you or not, could they?

A      The time ain't right. That's what I'm saying, the time ain't right. The people that was at the party in the videotape that I had would have shown that it's a timeline, and it wouldn't – it wouldn't fit. It wouldn't have fit. It wouldn't have fit.

Q      Okay. So are you saying that the crime occurred earlier or later than it was alleged at the trial?

A      I'm not saying a crime occurred at all.

Q      Well, the events where you two had sex, let me ask you that. Why is the time line so important? I mean, the fact of the matter is, you admit that you had sex with this thirteen-year-old girl. Correct?

A      I'm saying that I'm not guilty of rape. That's what I'm saying. I'm saying that I'm guilty of something, but it's not rape.

After saying that he had not seen photographs of the victim's injuries until he was testifying at his trial, the petitioner then was asked how he believed trial counsel should have dealt with these injuries:

A      He should have . . . found out who really put those cuts and bruises on her. That's what he should have found out. And if he would have did an investigation, it's a possibility that he would have really found out. If you read my transcript that I have, it will say that they asked the question, "Who put those – who put those cuts and bruises on you," and she said, "I don't know." And even this doctor – Sally – this Sally something, she even said the same thing; that she questioned the so-called victim about it, and the victim said, "I do not know." I don't recall.

Q      Now, is it your position that she got these injuries before or after you had sex with her?

A      It [is] my position that I don't know anything about the injuries until I seen the pictures. That's my position.

Q       So are you saying that somebody else gave her these injuries after you had sex with her?

A       I don't have the slightest idea.

Claiming that he could have done a better job defending himself than trial counsel had done, the petitioner then detailed the errors of counsel:

A       [Trial counsel] didn't listen to me.

Q       Okay. About what?

A       I was sitting there – I was sitting over there in that first chair – first I was sitting in that second chair, and Your Honor suggested that I move to the first chair.

Q       Okay.

A       And I had notes that I had written down, and I touched [trial counsel] on his jacket, and I tried to give them to him, but he didn't turn around. He didn't even acknowledge me.

Q       What –

A       And I'm thinking –

Q       – were those notes about? What did you want him to do?

A       I wanted him – okay, first of all, [trial counsel] weren't [sic] prepared because I asked him that.

Q       Could you answer my other question first[?] What was it that he didn't do that hurt you that you wanted him to do?

A       I wanted him to represent me right.

Q       What does that mean? You didn't really answer my question, Mr. Spencer.

A       (Pause.)

Q       You understand this is your day to prove this. You have to tell the judge what was wrong with your trial because of [trial counsel] – not because of the proof but because of [trial counsel]. What was it that [trial counsel] did that was so bad that made the jury convict you?

A       He didn't allow me to have witnesses.

Q       Okay. These witnesses who could testify about the time line, is that what you're saying? – or were there other witnesses?

A       I had a videotape, and the people had the videotape that came to this courtroom, but it just so happened I got reset. I don't know if [trial counsel] was my lawyer at that time or not. I don't know. I didn't know who was my lawyer.

Q       Let me ask you about the videotape. You said they brought it to the courtroom. Did they bring it during the trial, before the trial? – when did they bring the videotape?

A       It was during one of those court days. I don't know which one it was.

Q       What are these people's names?

A       I don't know their last name. I know their first name.

Q       Now, if you don't know their names –

A       I know their first names.

Q       – how is [trial counsel] supposed to find them? [Trial counsel] has got to go out and find these folks.

A       I could have got their names. I could have gotten their names.

Q       You can't get them anymore? Who are these people?

A       People that was at the party.

Q       You know their first names. Is that right?

A       Yes. Yes.

Further, the petitioner said that his trial counsel should have questioned the State's medical expert "about some hematomas," asserting that "you could get that by riding a bike – a bicycle. And that should have been challenged."

Asked to give further examples that his trial counsel was ineffective, the petitioner demurred, explaining that the questioning had gotten him off balance, and said, "I'm all shook up. I'm like Elvis right now. I'm shook up."

Trial counsel testified that he had practiced criminal law for ten years. He said that he had agreed to represent the petitioner "somewhere between three and four weeks" before trial. He visited the petitioner in jail "once or twice – something like that." He explained that although he had several other cases that had gone to trial before that of the petitioner, he was prepared for the petitioner's trial:

> For this case, yes. If I didn't, and if I could have honestly stood before Judge Dailey and looked him in the eye and said, "I'm not ready," I would have done it without any hesitation whatsoever. I've certainly done it before, but I couldn't do it in this case.

He explained what he had done to prepare for the trial:

> Obviously review the file. I talked with [the petitioner's previous attorney], at length, about the case. I discussed [the petitioner] with her, what he had been saying – things of that nature. What investigation she had done, what motions had been filed. I can't remember what that entailed; but, I mean, we talked about it. In reviewing it, another reason, going back to the continuance issue, is the fact that [the petitioner's previous attorney] had spent all this time preparing the case for trial, which was another reason I was perfectly comfortable coming in and trying the case is because of the preparation work that she had done. And I was relying on her heavily in this case. So, for those reasons, I didn't ask for a continuance.

He said that the petitioner's first attorney had filed motions and he had full discovery and did not file any additional ones "[s]ince there were no suppression issues." He said that he and the petitioner discussed his testimony and "how that might be difficult given the proof." Counsel was aware that Sally DiScenza, the State's medical witness, was a nurse practitioner, rather than a physician, and said that an attorney in his office, who also was a nurse, had reviewed the victim's records.

Trial counsel said he had "sat down" and gone over the file with the petitioner's first attorney when he replaced her. Additionally, he met with the petitioner and discussed the case, including cross-examination of witnesses, his right to testify and "what he was going to testify to." Counsel said that the State had a strong case against the petitioner. He did not recall the petitioner ever mentioning a videotape to him or receiving the names of witnesses.

The post-conviction court, in its written findings of facts and conclusions of law, found that trial counsel "did an outstanding job in representing the petitioner in what was an extremely difficult case. In the face of DNA evidence linking the [petitioner] to this crime, gruesome photographs of the injuries to this young victim, and other extremely compelling evidence presented by the state, this [petitioner] testified at trial and asserted a defense of consent." The post-conviction court found that the petitioner had failed to establish either that trial counsel was inadequate or that the petitioner had been prejudiced by counsel's alleged inaction and misdeeds. We concur. While the petitioner

made numerous complaints against trial counsel, he failed to show that the outcome of the trial would have been different had counsel proceeded in the fashion the petitioner now claims that he wanted. Likewise, as to these missing witnesses, the petitioner complains to no avail, for this court cannot presume that unidentified witnesses both would have been beneficial to the petitioner and altered the outcome of the case. See Black, 794 S.W.2d at 757-58.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition.

_____
ALAN E. GLENN, JUDGE